UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

JUAN CANDELARIA,

              Plaintiff,

      -vs-

HIGLEY, et al.,

              Defendants.

———————————————————————

**DECISION AND ORDER**

**No. 04-CV-0277(MAT)**

## I.   Introduction

Proceeding <u>pro</u> <u>se</u>, plaintiff Juan Candelaria ("Plaintiff" or "Candelaria") instituted this action pursuant to 42 U.S.C. § 1983 against defendants, who are representatives of the New York State Department of Corrections and Community Supervision ("DOCCS") and employees of Wende Correctional Facility ("Wende"). Plaintiff seeks redress for various constitutional injuries which he alleges were caused by Defendants while he was an inmate at Wende.

Plaintiff subsequently amended his complaint (Dkt ##4, 13, and 21), and the controlling pleading is now the Second Supplemental Complaint (Dkt #21), which is referred to hereinafter as "the Complaint." <u>See</u> Decision and Order (Dkt #44) at 1 n. 1. Following Defendants' Motion to Dismiss, the Court (Arcara, D.J.) dismissed various parties and causes of action. The following parties remain: Stanley L. Bukowski, M.D., physician at Wende ("Dr. Bukowski"), Donald Gorczynski, nurse at Wende ("Nurse Gorczynski")), Laurence J. Higley, Correctional Sergeant ("Sgt. Higley"), Robert A.

Kirkpatrick, Superintendent of Wende ("Sup't Kirkpatrick"), Girard
Monahan, Deputy Superintendent for Security of Wende ("DSS
Monahan"), Susan Post, Deputy Superintendent for Health Service of
Wende ("DSHS Post"), Kathleen Sainsbury, nurse at Wende ("Nurse
Sainsbury"), and Thomas Torrito, Corrections Officer ("CO
Torrito").

The following causes of action were preserved following
Defendants' motion to dismiss:

> (1) exposure to environmental tobacco smoke ("ETS") in
> violation of the Eighth Amendment;
>
> (2) denial of the use of a wheelchair and/or a walker in
> violation of the Eighth Amendment, against Dr. Bukowski,
> DSHS Post, Sgt. Higley, DSS Monahan, Sup't Kirkpatrick,
> CO Torrito, Nurse Gorczynski, Nurse Sainsbury, Jane Doe
> and Sgt. John Doe;
>
> (3) sexual assault in violation of the Eighth Amendment,
> against Dr. Bukowski, with the knowledge of Sup't
> Kirkpatrick and DSS Monahan;
>
> (4) deliberate indifference to Plaintiff's medical needs
> (failure to discontinue aspirin and anti-clotting
> medication) in violation of the Eighth Amendment, against
> Dr. Bukowski; and
>
> (5) issuance of false misbehavior reports and retaliation
> in violation of the First and Fourteenth Amendments,
> against Sgt. Higley and DSS Monahan.

See Dkt #44 at 7-8. However, as District Judge Arcara observed in
Dkt #44, the only defendants against whom the ETS/Eighth Amendment
cause of action was alleged were dismissed. Id. at 7, n.3. To date,
no new defendants have been substituted in regards to the
ETS/Eighth Amendment claim.

-2-

Defendants have filed a motion for summary judgment (Dkt #92) which Plaintiff has opposed (Dkt #102). Plaintiff has filed three cross-motions for summary judgment (Dkt ##103, 108 & 109) which Defendants have opposed (Dkt ## 113, 114). For the reasons that follow, Plaintiff's motions for summary judgment are denied, Defendants motion for summary judgment is granted, and the Complaint is dismissed.

## II.   Factual Background

Plaintiff's supporting allegations cover a number of disparate topics. To avoid unnecessary repetition, the facts pertinent to the alleged constitutional violations will be set forth below in the sections addressing Plaintiff's specific claims.

## III. General Legal Principles

### A.    42 U.S.C. § 1983

In order to state a claim under 42 U.S.C. § 1983, the plaintiff must establish the following elements: (1) conduct attributable at least in part to a person acting under color of state law, and (2) deprivation, as the result of the challenged conduct, of a right, privilege, or immunity secured by the Constitution or laws of the United States. Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993). The § 1983 plaintiff must adequately demonstrate "personal involvement of defendants in alleged Constitutional deprivations." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). "Personal involvement of a supervisory

official may be established 'by evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.'" Johnson v. Newburgh Enlarged School Dist., 239 F.3d 246, 254 (2d Cir. 2001) (quoting Colon, 58 F.3d at 873) (alterations in original)).

**B.   Summary Judgment Standard**

Summary judgment may be granted only when the moving party demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears burden of demonstrating that there is an absence of evidence to support the non-moving party's case. Celotex Corp, 477 U.S. at 323. When the movant has met this burden, Rule 56(e) provides that the non-moving party "may not rest upon the mere allegations . . . [of his] pleading, but . . . must set forth specific facts showing that

there is a genuine issue for trial." <u>Anderson v. Liberty Lobby,</u> <u>Inc.</u>, 477 U.S. 242, 257 (1986). Rule 56(c) further requires the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to his case and upon which that party will bear the burden of proof at trial. <u>Celotex Corp.</u>, 477 U.S. at 322.

The "mere existence of a scintilla of evidence" supporting the non-moving party's cause is insufficient. <u>Anderson</u>, 477 U.S. at 252. The non-moving party may not rely on evidence that is merely colorable, conclusory, or speculative but must come forward with "concrete evidence from which a reasonable jury could return a verdict in [his] favor."  <u>Id.</u> at 256.

**IV.  Discussion**

**A.  First Cause of Action: Exposure to ETS in Violation of the Eighth Amendment**

In his first cause of action, Plaintiff alleges that he has been exposed to ETS, commonly known as second-hand smoke, and that such exposure was made with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.  As noted above, Plaintiff's cause of action for exposure to ETS was directed at former defendants Glenn Goord, Anthony J. Annucci, John Nuttall, and Dr. Lester Wright. Plaintiff does not allege that any of the remaining Defendants are responsible for his being exposed to ETS. Plaintiff did not seek to add a new defendant until July 2012, two months after Defendants

-5-

responded to his summary judgment motion, when he mentioned in one of his responsive pleadings (Dkt #116) that he wished to substitute DOCCS Commissioner Brian Fischer ("Comm'r Fischer") for former Commissioner Glenn Goord. This does not change the result, for he has not provided any evidence that Comm'r Fischer had knowledge of an excessive risk posed by ETS to Candelaria which he then disregarded. Therefore, this claim must be dismissed for failure to establish personal involvement in a constitutional injury by Comm'r Fischer or any of the remaining named defendants. See Johnson v. Goord, No. 01 Civ. 9587(PKC), 2005 WL 2811776, at *5-8 (S.D.N.Y. Oct. 27, 2005) (dismissing ETS claim where did not supply any evidence that defendants were "personally involved" in any alleged deprivation as there was "no evidence of negligent supervision of subordinates, ignorance of evidence of any alleged constitutional violation, nor the creation or allowing the continuation of a policy or custom permitting unconstitutional practices") (citing Johnson, 239 F.3d at 254); Zaire v. Artuz, No. 99 Civ. 9817(LTS), 2003 WL 230868, at *5-6 (S.D.N.Y. Feb. 3, 2003) (similar).

**B.  Second Cause of Action: Denial of Wheelchair in Violation of the Eighth Amendment**

**1.  Factual Background**

Candelaria claims to be wheelchair-bound due to an encounter with New York City Corrections Officers in 1988, and also surmises that his condition may be related to a previous motor vehicle accident. Deposition of Juan Candelaria ("Pl's Dep.") at 11-13.

Plaintiff is convinced that he is a paraplegic, and that the cause of his paraplegia is a traumatic spinal injury. Id. With regard to his symptoms, Plaintiff states that he has no feeling below his waist, has weakness in his legs, and can only walk with a walker for a period of fifteen minutes. Id. According to Plaintiff, the weakness in his legs had a gradual onset following the 1988 incident. Id. at 14. Since entering DOCCS custody, Plaintiff has participated in physical therapy for his legs, which he believes has been helpful. Pl's Dep. at 19.

At Wende, the decision of whether an inmate is permitted to use a wheelchair, walker or other assistive device is made by the medical staff. Declaration of Sgt. Higley ("Higley Decl."), ¶ 11; Declaration of CO Torrito ("Torrito Decl.") ¶ 10. If an inmate does not have permission from the medical department to have a device such as a wheelchair, walker, or cane, that device is considered contraband. E.g., Higley Decl., ¶ 12.

Based on his ongoing treatment and multiple examinations of Plaintiff, as well as his review of the pertinent medical records and his own personal observations, Dr. Bukowski opined that Plaintiff is not paralyzed, although he does have weakness in his legs. Declaration of Stanley Bukowski, M.D. ("Bukowski Decl."), ¶¶ 23, 31. Notably, five neurologists have been unable to find any neurological deficits with the Plaintiff, and at least one neurologist has opined that Plaintiff is malingering. Id.,

¶¶ 25-29. Other physicians have opined that Plaintiff's mobility problem is psychogenic rather than organic. Id., ¶ 27. Plaintiff's medical records contain several comments to the effect that he exaggerates his physical limitations, as well as notations that Plaintiff has been seen walking and even jogging without assistance. Id., ¶¶ 29-30. It is Dr. Bukowski's considered medical opinion that Plaintiff can walk with a cane, and that neither a wheelchair nor a walker is medically indicated. Bukowski Decl., ¶¶ 23, 42.

In 2004, Plaintiff filed a grievance regarding the fact that he was not provided with a wheelchair at all times. DSHS Post discussed the Plaintiff's ability to ambulate with his treating physician and was informed that Plaintiff was ambulating well with the aid of a walker, and that a wheelchair was only necessary for longer trips. Declaration of Susan Post ("Post Decl."), ¶ 18 (citation omitted). DSHS Post passed this information along to Plaintiff. Id. As Plaintiff progressed through treatment, the medical staff decided that he had the ability to walk using only a cane.[1]

----

[1]

DSHS Post notes that "[i]f an individual progresses to the point where he can ambulate with a less restrictive mobility device, as with a walker as opposed to a wheel chair, or a cane as opposed to a walker, he should be encouraged to do so, as this will improve his mobility over time, and therefore, his overall health. An individual who can use a less restrictive mobility device, but chooses not to, such as the plaintiff, will become less mobile over time, and will predispose himself to muscle atrophy and reduce his ability to ambulate. This can lead to co-morbidities and negatively

Plaintiff complained about the lack of a wheelchair again in a letter dated August 25, 2006, to DSHS Post, who met with him on August 28, 2006. DSHS Post informed Plaintiff that medical staff decided that he had the ability to walk using only a cane. DSHS Post, however, felt that a wheelchair should still to be used for transporting him to offsite medical appointments. Post Decl., ¶¶ 32 (citation to record omitted). Plaintiff was notified that he would be provided with a standard DOCCS wheelchair in the event that he sent his personal wheelchair home. Post Decl., ¶ 18. In January of 2007, the plaintiff decided to send his personal wheelchair home. He was informed that DOCS would provide a standard wheelchair for outside trips, in accordance with his medical records.

In October 2006, DSHS Post and Dr. Bukowski met with Plaintiff in response to Grievance WDE-25262-06. Dr. Bukowski informed Plaintiff that the medical staff's current opinion was that Plaintiff was capable of walking with a cane. This opinion was supported by an outside medical specialist, who also opined that Plaintiff was malingering. Dr. Bukowski informed Plaintiff that no special training was required to use a cane and noted that he had personally observed Plaintiff walking with a cane.

Plaintiff's deposition testimony belies his constant need for a wheelchair. For instance, prior to his kidney transplant in 2005,

---

effect his pre-existing health conditions." Post Decl., ¶ 23 (citation to record omitted).

Plaintiff says that he was able to use the walker for fifteen minutes. Pl's Dep. at 18-19. After his kidney transplant, Plaintiff testified, he felt better using the walker permanently. Id. at 38-39. While recovering from surgery, he continued to use a walker while outside of his room. Bukowski Decl., ¶ 33. While housed at the infirmary at Wende, Plaintiff participated in programs, including working as a Law Library Clerk and in Laundry. Pl's Dep. at 33; Post Decl., Ex. E. Plaintiff also was able to participate in outdoor recreation while staying at the infirmary. Pl's Dep. at 34.

Plaintiff has attempted to create an issue of fact by submitting the affidavit of José Diaz ("Diaz Aff.") (Dkt #103, pp. 4-5). In it, Diaz avers that he assigned to work as handy man in the infirmary at Wende; that he was told by unidentified staff members to put Plaintiff's food trays where Plaintiff could not reach them; that when he retrieved those trays, he often noticed that the food was untouched and consequently informed unnamed staff members; that Plaintiff told him that he was hungry, but that he was too weak to walk over to the tray; and that when Diaz tried to put the trays within Plaintiff's reach, he was told not to by unnamed corrections officers. See Dkt #103, ¶¶ 1-3. As Defendants argue, Diaz's affidavit is far too vague to create a genuine issue of material fact. See, e.g., Grieveson v. Anderson, 538 F.3d 763, 778 (7th Cir. 2008) ("Vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the

alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants.") (citation omitted).

In sum, it is clear on the evidence presented that the conduct here at issue does not reach the level of a constitutional violation. Far from evidencing a deliberate indifference to Candelaria's medical needs in regard to his difficulties ambulating, the record demonstrates that Defendants, in particular Dr. Bukowski and DSHS Post, carefully considered his situation and made medically appropriate decisions regarding accommodations. See McCloud v. Delaney, 677 F. Supp. 230, 232 & n. 9 (S.D.N.Y. 1988) ("[T]here is no right to the medical treatment of one's choice if the prescribed treatment is based on applicable medical standards.") (citing, inter alia, Youngberg v. Romeo, 457 U.S. 307, 323 (1982) (in action under § 1983 for deprivation of fourteenth amendment rights in treatment of involuntarily committed mental patient, liability could only be imposed "when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment")). This cause of action is accordingly dismissed.

C.      **Third Cause of Action: Sexual Assault in Violation of the Eighth Amendment**

1.      **Factual Background**

As his third cause of action, Candelaria asserts that Dr. Bukowski's performance of a rectal exam constituted an act of rape and sodomy, and that Sup't Kirkpatrick and DSS Monahan are also liable for failing to respond appropriately to Plaintiff's grievance regarding the alleged sexual assault.

On August 11, 2006, Candelaria claims that he collapsed and fainted while walking with a "quad cane" in the area of Wende known as "Times Square". Plaintiff "believes" he lost consciousness but regained consciousness at the Wende infirmary where, in response to Dr. Bukowski's questions, Plaintiff moaned incomprehensibly and did not open his eyes. Plaintiff makes the assertion that he understood everything that was happening, but could not speak. Pl's Dep. at 50-51.[2]

Dr. Bukowski's examination revealed that there were no visible injuries or bruising. When palpating Plaintiff's abdomen, however, Plaintiff moaned. This indicated to Dr. Bukowski that Plaintiff might have sustained an internal injury. Accordingly, Dr. Bukowski proceeded to perform a rectal examination. When it was finished,

---

[2]

There is no medical evidence supporting this fairly incredible assertion that Plaintiff was temporarily rendered mute.

Plaintiff began screaming, but his eyes remained shut and he did not speak.

Wende official transported Plaintiff to the Erie County Medical Center ("ECMC") for further evaluation. No injuries from the alleged fall were discovered, although medical staff at ECMC found that Plaintiff was suffering from constipation and a colonic ileus (a partial or complete blockage of the bowel).

Plaintiff believes that the August 11, 2006 rectal examination was part of a course of homosexual conduct[3] on the part of Dr. Bukowski, and violated his (Plaintiff's) religious beliefs.

## 2.   Analysis

The Second Circuit has noted that sexual abuse by prison officials is "simply not part of the penalty that criminal offenders pay for their offenses against society." Boddie v. Schneider, 105 F.3d 857, 86-61 (2d Cir. 1997) (citing Farmer, 511 U.S. at 834). Sexual misconduct that is "[s]evere or repetitive . . . can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." Id. (quotation omitted). A subjective element also is required, but where no legitimate law

---

[3]

Dr. Bukowski had requested that Plaintiff undergo a rectal examination on May 13, 2005, as he believed it was medically indicated. Candelaria's fellow inmate, Diaz, states in his affidavit that he "frequently" observed Dr. Bukowski "peering" into Plaintiff's room while Plaintiff was naked and taking a "bird bath" on his bed. See Dkt #103, ¶ 3. Diaz also states that Candelaria informed him that Dr. Bukowski had made homosexual advances upon him. See id., ¶ 4.

enforcement or penological purpose can be inferred from the defendant's alleged conduct, "the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." Id. (citing Hudson v. McMillan, 503 U.S. 1, 6-7 (1992)). However, allegations of isolated incidents of sexual comments or non-consensual touching may not be "objectively, sufficiently serious" to show harm of federal constitutional proportions. Id. As discussed further below, it is clear that no violation of Candelaria's Eighth Amendment rights occurred.

Plaintiff, by his own admission, was unconscious and unable to respond appropriately to Dr. Bukowski's questions during the examination following Plaintiff's August 11, 2006 fall. The fact that Plaintiff had fallen, appeared to be unconscious, and expressed pain when his abdomen was examined, reasonably suggested to Dr. Bukowski that Plaintiff might have sustained internal injuries. Under these circumstances, Plaintiff has not raised a triable issue of fact as to whether the rectal examination was medically justified and was related to a legitimate penological purpose, i.e., providing medical treatment to a possibly injured inmate. See, e.g., Harris v. Herbik, Civil Action No. 05-279, : 2007 WL 4561480, at *10 (W.D. Pa. Dec. 20, 2007) (holding that conducting a rectal examination during an initial screening of an inmate does not amount to sexual abuse; plaintiff did not allege that doctor performed examination in a manner designed to inflict

pain or discomfort) (citing, <u>inter alia</u>, <u>Soles v. McGee</u>, No. Civ.A. 07-4257KSH, 2007 WL 2868097, at *3-4 (D. N.J. Sept. 26, 2007) ("Soles alleges that defendant McGee performed an unsupervised search of his anal cavity. This isolated incident is the sole basis of plaintiff's sexual harassment claim. These allegations, even if true, do not rise to the level of a constitutional deprivation. Soles does not allege that he was subjected to severe or repetitive sexual abuse, touching or harassment; rather, he alleges only one isolated incident. Moreover, the isolated incident appears to have been a routine anal search for contraband, namely, drugs, a legitimate administrative or security concern for prisons. There is no suggestion by plaintiff in his Complaint that the anal cavity search was done for any purpose other than as a search for contraband, which plaintiff did not possess.") (internal citations omitted); <u>Neal v. Swigert</u>, 2005 WL 1629779, at *2 (S.D. Ohio July 6, 2005)); <u>see also</u> <u>Sanchez v. Pereira-Castillo</u>, 590 F.3d 31-43-44 (1st Cir. 2009).

Plaintiff's third cause of action against Dr. Bukowski, Sup't Kirkpatrick, and DSS Monahan fails as a matter of law to establish a constitutional violation. Therefore, it is dismissed.

**D.  Fourth Cause of Action: Failure to Discontinue Anti-Blood-Clotting Medication Prior to Kidney Biopsy in Violation of the Eighth Amendment**

**1.  Factual Background**

While housed at Wende, Candelaria was treated by medical staff for a variety of conditions, including renal failure (resulting in hemodialysis, peritoneal dialysis, and a kidney transplant); hypertension, alleged paralysis and difficulty ambulating; anemia; deep vein thrombosis; hemoptysis (expectoration of blood or of blood-stained sputum; a <u>Mycobacterium gordonae</u> bacterial infection; and alleged neurological deficits. <u>See</u> Bukowski Decl., ¶ 21. Of particular regard to this cause of action is Plaintiff's diagnosis with renal disease in 1997. On October 11, 2005, he received a kidney transplant and was placed in the Wende infirmary to recover. In February of 2006, Plaintiff was informed that he needed to undergo a kidney biopsy, and that he should refrain from taking aspirin or other anti-blood-clotting medications.

Dr. Bukowski indicates that Plaintiff's kidney biopsy occurred on February 17, 2006. He admits that the outside nephrology specialist "may have instructed [Wende staff] to hold aspirin for a week prior to the biopsy, as that is the standard practice." Bukowski Decl., ¶ 12. Dr. Bukowski states that he was aware of this standard practice, but he did not hold aspirin in Candelaria's case. Dr. Bukowski asserts that this was "an accidental omission on [his] part, and not a deliberate act against Plaintiff." <u>Id.</u>

-16-

On February 14, 2006, Dr. Bukowski realized his mistake and ordered that Plaintiff discontinue any anti-blood-clotting agents, such as aspirin, in the days leading up to the procedure. According to Candelaria, he was given aspirin on the day of, or just before, the biopsy. Medical records, however, indicate that Plaintiff was given aspirin within one week of the biopsy on February 17, 2006, but not after February 15, 2006. See Bukowski Decl., ¶ 14.

Plaintiff told the evening nurse on February 16, 2006 that he himself was going to ask the kidney specialist the next morning whether the biopsy should be rescheduled. The evening nurse left a voice-mail message for the physician's assistant responsible for coordinating arrangements for transplant patients, but Dr. Bukowski stated he was unaware if the physician's assistant received the message prior to the biopsy. In any event, the biopsy proceeded as scheduled.

Following the biopsy, Plaintiff bled into the kidney and into the urine from the biopsy, and accordingly was admitted to ECMC from February 17 to 24, 2006. He was found to have a hematoma in the renal hilum, point at which the renal artery enters the organ, and the renal vein and ureter leave the organ. See Bukowski Decl., ¶ 17. Before the biopsy, Plaintiff's creatinine level was 1.7 indicating, mild renal impairment. Upon admission to ECMC, Plaintiff's renal function temporarily worsened but later improved. His urinary blood cleared by February 22, 2006, and he otherwise

responded well to treatment. He was released from ECMC on February 24, 2006, by which time his renal function was as good as it had been prior to the biopsy. In particular, his creatinine level was 1.6, slightly better than the reading of 1.7 before the biopsy. Dr. Bukowski concedes that the bleeding was "most likely due to the aspirin," but asserts that "there was no permanent damage to the transplanted kidney."

## 2. Analysis

"[D]eliberate indifference to serious medical needs" violates a prisoner's constitutional rights." Estelle v. Gamble, 429 U.S. at 103-04. The Court assumes arguendo that Candelaria sustained a "sufficiently serious . . . condition of urgency", namely, the development of urinary bleeding and a hematoma as the result of ingesting aspirin prior to his February 2006 biopsy. However, Candelaria cannot establish the subjective component of his Eighth Amendment claim—that Dr. Bukowski acted with a sufficiently culpable state of mind, one that is "more blameworthy than negligence." Farmer v. Brennan, 511 U.S. at 835. The Supreme Court has described "deliberate indifference" as the "equivalent [of] criminal negligence." Id. at 835. Thus "medical malpractice is . . . insufficient to support an Eighth Amendment" deliberate indifference claim. Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003).

Here, Dr. Bukowski admits that he erred in failing to adhere to the standard practice of discontinuing anti-blood-clotting medications, and that aspirin mistakenly was administered to Candelaria until two days prior to the biopsy, when Dr. Bukowski realized his mistake. Even if Dr. Bukowski's error in this regard amounted to negligence, or even gross negligence, that still would be insufficient to establish deliberate indifference to Candelaria's serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir.1990) ("This conduct [confiscation of inmate's sling], though apparently inexcusable, does not amount to deliberate indifference. While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice. Although Wood's treatment was not as prompt or efficient as a free citizen might hope to receive, Wood was given medical care at the prison that addressed his needs.") (citation omitted).[4] This cause of action accordingly must be dismissed.

---

[4]

Where a prison inmate has alleged injury as the result of a mistaken administration of a dose of medication, courts have held specifically that this does not constitute deliberate indifference. Daniels v. Ferguson, No. 06-5072, 2007 WL 2609778, at *18 (W.D. Ark. Sept. 6, 2007) (citing, inter alia, Colon v. Corr. Med. Servs., No. 07-189, 2007 WL 2257424, at *2 (D. Del. Aug. 1, 2007)("[E]ven accepting Plaintiff's allegations as true, the Court concludes that the act of giving the wrong medication does not rise to the level of deliberate indifference.")).

E. **Fifth Cause of Action: Filing of False and Retaliatory Misbehavior Reports**

1. **Factual Background**

Candelaria alleges that Sgt. Higley personally filed, or coerced other corrections officers into filing, "more than 18" false misbehavior reports against him in retaliation for filing a grievance complaining that Sgt. Higley was interfering with his medical treatment on September 9, 2003. Plaintiff also asserts that DSS Monahan instigated Sgt. Higley into filing the false reports. Plaintiff testified that he did not know whether he actually was found guilty of any of these purported misbehavior reports and, if so, whether they were reversed on administrative appeal or in a state court action pursuant to Article 78 of New York Civil Practice Law and Rules. See Pl's Dep. at 71-72. Defendants indicate that Sgt. Higley authored three misbehavior reports against Candelaria dated December 20, 2003; January 17, 2004; and May 4, 2004. Sgt. Higley denies that they were false. DSS Monahan denies any involvement in Candelaria's allegations concerning the misbehavior reports, and Candelaria has not offered any proof to contradict this denial. With regard to the remaining misbehavior reports about which he complains, Candelaria has not specifically attributed them to Sgt. Higley or DSS Monahan in his complaint. See Dkt #21, ¶ 45. His vague references to Sgt. Higley and DSS Monahan purportedly directing others to file misbehavior reports are not supported by any evidence in the record.

## 2.   Analysis

"[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (citing Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)). The inmate must establish additional conduct by prison officials, "such as retaliation . . . for exercising a constitutional right." Id. (citing Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)). The elements of a First Amendment retaliation claim are as follows: (1) the plaintiff has engaged in protected speech or conduct; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action. E.g., Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 995, 152 L.Ed.2d 1 (2002), as recognized in Phelps v. Kapnolas, 308 F.3d 180, 187 n.6 (2d Cir. 2002). Because they are easily fabricated, prisoner claims of retaliation must be approached with "skepticism and particular care". Dawes, 239 F.3d at 491.

Assuming for the sake of argument that Candelaria can demonstrate constitutionally protected activity and adverse action, he has failed to introduce any evidence sufficient to create a triable issue of fact as to the element of causal connection. "[A] plaintiff may not rely on conclusory assertions of retaliatory

motive to satisfy the causal link. Instead, he must produce 'some tangible proof to demonstrate that [his] version of what occurred was not imaginary.'" See <u>Cobb v. Pozzi</u>, 363 F.3d 89, 108 (2d Cir. 2004) (internal citations omitted; alterations in original). The Second Circuit has held that temporal proximity between an inmate's grievance and disciplinary action may serve as circumstantial evidence of retaliation, as can evidence of the inmate's prior good behavior and his vindication at a hearing. <u>Colon v. Coughlin</u>, 58 F.3d at 872-73 (citations omitted). Viewing his pleadings with an exceedingly lenient eye, the only factor in favor of Candelaria is arguably temporal proximity, as he claims that he engaged in protected activity in "late 2003", and the first misbehavior report issued by Sgt. Higley was issued in December 2003. However, this weak evidence of temporal proximity is negated by the fact that the December 2003 report, along with the other two reports, was never reversed on appeal. Moreover, Candelaria has failed to establish that it was filed without good cause.[5] Plaintiff's disciplinary record does not provide circumstantial evidence of retaliatory motive, as he was disciplined fifteen times prior to the issuance

---

[5]
Sgt. Higley filed the report after being informed that Plaintiff had made lewd and inappropriate comments to a female member of the medical staff, in violation of prison disciplinary rules. <u>See</u> N.Y. COMP. CODES R. & REGS., tit. 7, § 270.3, Rule 107.11 ("An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures . . . .").

of the first misbehavior report by Sgt. Higley in December 2003. Candelaria's claim that Sgt. Higley and DSS Monahan conspired to retaliate against him for filing a grievance rests on speculation conclusory assertions. As such, it must be dismissed. See Leon v. Murphy, 988 F.2d 303, 311 (2d Cir. 1993); Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).

## V.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. #92) is granted, and the Complaint (Dkt. #21) is dismissed in its entirety with prejudice. Plaintiff's Cross-Motions for Summary Judgment (Dkt ## 103, 108, 109) are denied with prejudice. The Clerk of the Court is directed to close the case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:   January 8, 2013
         Rochester, New York